**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ruth Foster, | No. CV-22-00290-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Ruth Foster's appeal from the Commissioner of the Social Security Administration's ("SSA") denial of her application for Disability Insurance Benefits ("DIB"). (Doc. 1). This appeal is fully briefed (Doc. 11, Doc. 15, Doc. 18), and the Court will now rule.

**I.    BACKGROUND**

The issues presented on appeal are whether the Administrative Law Judge ("ALJ") met her burden of proving transferability of work skills, whether the ALJ considered mental limitations when finding Plaintiff's residual functional capacity (RFC), and whether the ALJ was properly appointed. (*See* Doc. 11 at 1–2). Because the third issue is controlling, the Court will address it first. This Court finds that the ALJ in this case was not properly appointed. But, because there is no nexus between the Commissioner of the Social Security Administration's unlawful service and any harm suffered by Plaintiff, remand is not appropriate. This Court also finds that the ALJ made no error in making a transferability determination or in finding Plaintiff's RFC.

### a.  Factual overview

Plaintiff alleges that her disability began in August of 2018. (Doc. 11 at 3). In April 2019, she filed for DIB, but was denied at both the initial and reconsideration levels. (*See id.* at 2).  She claims to suffer from degenerative disc disease, osteoarthritis, radiculopathy, obesity, and obstructive sleep apnea. (*Id.* at 3). In March of 2021 she had a hearing before an ALJ who denied her claim. (*See id.*). The Appeals Council subsequently denied her request for review. And the ALJ's decision became the final decision of the Commissioner. She now appeals that decision.

### b.  The Appointments Clause

The Constitution divides the power to appoint officers of the United States between the President and the Senate. *See* U.S. Const. Art. II, § 2, cl. 2. The President nominates a candidate, and the Senate provides advice and consent. *See id.* Through this mechanism, the Constitution recognizes that although the President alone wields the executive power, there are certain circumstances in which that power must be delegated so that it can be exercised efficiently. *See United States v. Arthrex, Inc.*, 141 S.Ct. 1970, 1978–79 (2021). He must be able to appoint officials to oversee executive agencies. But it also ensures that this power to delegate is moderated by the influence of the Senate. The Appointments clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not otherwise herein provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II, § 2, cl. 2.

It thus creates a two-step system that splits power between the President and the Senate in the appointments process. The framers did this to ensure accountability for the appointee's actions. *See Arthrex*, 141 S.Ct. at 1979. When the people know that a certain official was nominated by the President, blame for that official's bad actions will "fall upon the

president singly and absolutely." *See id.* (quoting The Federalist No. 77, p. 517 (J. Cooke ed. 1961) (A. Hamilton)). The Appointments clause also places a degree of that responsibility on the Senate "for both the making of a bad appointment and the rejection of a good one." *Id*.

The Clause also divides officers into different classes. The highest class are the so called "principal officers." These officers must be nominated by the President and approved by the Senate. The second class are the so called "inferior officers." While the default rule for their appointment is the same, Congress can vest their appointment in the President, the Courts, or in department heads. *See* Art. II, §2, cl. 2. This reflects a concern for "administrative convenience," as it would be difficult to keep those offices staffed if they had to be filled through the formal advice and consent process. *See Arthrex*, 141 S.Ct. at 1979.

### c.  The Federal Vacancies Reform Act

In 1998, Congress set out to completely overhaul the then one-hundred-and-thirty-year-old Vacancies Act to ensure efficient staffing of the executive branch, and to ensure that the President was only appointing officials to vacant positions through the system set forth by Congress. *See* M. Rosenberg, *Congressional Research Service Report for Congress, The New Vacancies Act: Congress Acts To Protect the Senate's Confirmation Prerogative* 2–4 (1998) [hereinafter Rosenberg]. The Federal Vacancies Reform Act ("FVRA") grants the President the power to fill vacant offices with acting officers who can serve, subject to certain time constraints, before and during the pendency of a formal nomination to that office. *See* 5 U.S.C. § 3345–3346. It was designed to provide "optimal flexibility and administrative continuity ...." Rosenberg at 9. Ultimately, it gives the President the sole authority to appoint acting officers, while constraining the types of people he can place in temporary power.

The FVRA gives the President three options when appointing acting officers. The default is that "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily and in an acting capacity ...." 5 U.S.C. § 3345(a). The

1    President can select others to fill the role, however. *Id* § 3345(b)–(c). He can direct another

2    officer who has already gone through the advice and consent process (a "PAS" officer), to

3    temporarily take the post. *See id.* § 3345(b). And he can also direct an employee of that

4    agency to take over the role under certain circumstances. *See id.* § 3345(c).

5            All of these options are subject to time constraints set forth in the FVRA. Section

6    3346 states:

7    "(a) Except in the case of a vacancy caused by sickness, the person serving as an acting

8    officer as described under section 3345 may serve in the office--

9            (1) for no longer than 210 days beginning on the date the vacancy occurs; or

10           (2) subject to subsection (b), once a first or second nomination for the office is

11   submitted to the Senate, from the date of such nomination for the period that the nomination

12   is pending in the Senate.

13          (b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or

14   returned to the President by the Senate, the person may continue to serve as the acting

15   officer for no more than 210 days after the date of such rejection, withdrawal, or return.

16          (2) Notwithstanding paragraph (1), if a second nomination for the office is submitted

17   to the Senate after the rejection, withdrawal, or return of the first nomination, the person

18   serving as the acting officer may continue to serve--

19          (A) until the second nomination is confirmed; or

20          (B) for no more than 210 days after the second nomination is rejected, withdrawn,

21   or returned.

22          (c) If a vacancy occurs during an adjournment of the Congress sine die, the 210-day

23   period under subsection (a) shall begin on the date that the Senate first reconvenes." *Id.* §

24   3346. Section 3346 sets forth the time period during which the acting officer can serve and

25   describes how that period changes based on the President taking actions to appoint a

26   permanent officer.

27          The FVRA also includes provisions for periods when no officer has been appointed

28   and no one is serving temporarily under the Act. The FVRA states that:

1
2
3
4

> Unless an officer or employee is performing the functions and duties in accordance with [the Act] ... if an officer of an Executive agency ... whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--
> (1) The office shall remain vacant ....

5

> *Id.* § 3348(b).

6

This section also changes the timeframe in which the two-hundred-and-ten-day period is

7

counted for times when the Senate is not in session. It states that "[i]f the last day of any

8

210-day period under section 3346 is a day on which the Senate is not in session, the second

9

day the Senate is next in session and receiving nominations shall be deemed to be the last

10

day of such period." *Id.* § 3348(c). Finally, it notes that any actions taken by officials

11

outside of the constructs of the Act have no force or effect. *Id.* § 3348(d)(1).[1]

12

### d. Commissioner Berryhill

13

Plaintiff alleges that ALJ Papazekos did not have the authority to adjudicate her

14

claim because she was not properly appointed. This assertion is based on Plaintiff's claim

15

that Commissioner Berryhill was not lawfully acting as Commissioner of the Social

16

Security Administration when she appointed ALJ Papazekos. In order to decide this claim,

17

then, this Court must look at the timeline of Commissioner Berryhill's service to see if it

18

aligns with the timelines set forth in the FVRA.

19

Shortly before his second term expired, in December of 2016, President Obama

20

issued a memorandum setting forth an order of succession for the SSA. Memorandum,

21

Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg.

22

963367 (Dec. 23, 2016). The memo provides that the Deputy Commissioner for Operations

23

will take the place of the Commissioner should the office become vacant. *Id.* This memo

24
25
26
27
28

---

[1] It should be noted that the FVRA is not the exclusive means whereby the President can appoint an Acting Commissioner. Section 3347 of the FVRA provides that the Act is the exclusive means of temporarily authorizing an acting official to serve unless another statute expressly provides the President the authority to do so. *See* 5 U.S.C. § 3347(a); *Hooks v. Kitsap Tenant Support Services, Inc.*, 816 F.3d 550, 556 (9th Cir. 2016). For the SSA 42 U.S.C. § 902(b)(4) provides the President with such authority. Here, neither party argues that the President was acting under this independent authority in appointing Acting Commissioner Berryhill, however. And Defendants expressly disclaim that the President was using this authority. (*See* Doc. 15 at 23). Thus, this Court will only analyze whether Berryhill was lawfully serving as Acting Commissioner under the FVRA.

was in place when President Trump took office in January of 2017. Additionally, on Inauguration Day, then Acting Commissioner Colvin resigned. *See Brian T.D. v. Kijakazi*, 580 F.Supp.3d 615, 620 (D. Minn. 2022). In accordance with the memo, the Deputy Commissioner for Operations, Nancy Berryhill, then assumed the role of Acting Commissioner. *See id.* Pursuant to his duties under Section 3349 of the FVRA, on March 6, 2018, the Comptroller General reported that Acting Commissioner Berryhill was serving in violation of the Act. *See id.* at 620–21. She had stayed in the role past the two-hundred-and-ten-day time limit, and the President had not nominated anyone to serve as Commissioner. The Government Accountability Office stated that Commissioner Berryhill was no longer lawfully serving as Acting Commissioner after November 17, 2017. *See* B-329853, *Violation of the 210-day Limit Imposed by the Vacancies Reform Act of 1998—Commissioner, Social Security Administration*, Mar. 6, 2018, at 1, https://www.gao.gov/assets/700/690502.pdf [hereinafter GAO Report]. It noted that Ms. Berryhill could continue to serve as Deputy Commissioner and could perform the delegable functions and duties of the Commissioner. *See id.* at 2.

On April 17, 2018, President Trump nominated Andrew Saul to serve as Commissioner of the SSA. *See Brian T. D.*, 580 F.Supp.3d at 621. Once the nomination was submitted, Berryhill claimed that she could resume her position as Acting Commissioner and did so. *See id.* Two months later, in June 2018, the Supreme Court decided *Lucia v. S. E. C. See Lucia v. S. E. C.*, 138 S.Ct. 2044 (2018). There, the Court held that SEC ALJs were Officers of the United States for purposes of the Appointments Clause. *See id.* at 2055. Because the ALJs were appointed by SEC staff members, rather than by the Commissioners, they were not constitutionally appointed and had no power to adjudicate claims. *See id.* at 2049, 2055. Much like the SEC ALJs, the SSA ALJs were also appointed by staff members, rather than by the Commissioner. *See Brian T. D.*, 580 F.Supp.3d at 621. In response to this, on July 16, 2018, supposed Acting Commissioner Berryhill ratified the appointments of all SSA ALJs and approved them as her own. *See* Social Security Ruling 19-1p, 84 Fed. Reg. 9582-02, 9583 (March 15, 2019). At the time

1    that she ratified the appointments she was serving well in excess of the two-hundred-and-

2    ten-day period as set forth in the FVRA.

3         Because Berryhill claimed to have ratified the appointments of all SSA ALJs,

4    Plaintiff cannot bring a straightforward *Lucia* claim. Instead, she argues that Berryhill was

5    not lawfully serving as Acting Commissioner, and thus that her ratification had no effect.[2]

6    (*See* Doc. 11 at 20). Consequently, she claims, because the ALJ's appointments were not

7    ratified by an Acting Commissioner, the ALJ who heard her case had no power to

8    adjudicate her claim. (*See id.* at 21). The Ninth Circuit Court of Appeals has not decided

9    this issue. Therefore, this Court must assess whether Berryhill had the authority to serve as

10   Acting Commissioner after President Trump had nominated Andrew Saul.

11   **II.    ANALYSIS**

12        In determining the requirements of statutes, courts must begin with the text. *See*

13   *Ross v. Blake*, 578 U.S. 632, 638 (2016). When the text of a governing statute is plain, that

14   is where the inquiry begins and ends. The only thing left for courts to do at that point is

15   "enforce [the act] ... according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534

16   (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1,

17   6 (2000) (internal quotation marks omitted) in turn quoting *United States v. Ron Pair*

18   *Enterprises, Inc.*, 489 U.S. 235, 241 (1989), in turn quoting *Caminetti v. United States*, 242

19   U.S. 470, 485 (1917)). Not only is this principle firmly established in United States law, it

20   is also rooted in the earliest legal standards. Justinian's *Digest* commands, "[d]o not depart

21   from the words of the law[.]" Antonin Scalia & Brian A. Garner, *Reading Law: The*

22   *Interpretation of Legal Texts* 56 (2012) [hereinafter *Reading Law*] (quoting *Digest* 32.69

23   pr. (Marcellus)). When interpreting text, this Court must assume "that the ordinary meaning

24   of that language accurately expresses the legislative purpose, and that language must be

25   enforced according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242,

26   ────────────────

27   [2] 5 U.S.C. § 3348(d)(1) states that, "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which this section, [and the other relevant sections of the Act] ... apply shall have no force or effect." 5 U.S.C. § 3348(d)(1). Thus, if someone was purporting to serve as Acting Commissioner after the time allotted under the Act had elapsed, but was not lawfully doing so, that person's actions would have no effect.

28

251 (2010). Thus, in order to assess whether Berrryhill was legally serving as Acting Commissioner of the SSA at the time she ratified the ALJ appointments, this Court must look to the statutory text of the FVRA.

### a. "Currently Serving" or "May Serve"

At the heart of this question is timing. Whether Berryhill had the legal authority to reappoint the ALJs turns on whether she was lawfully serving according to the timelines set forth in the FVRA. Section 3346 sets forth the timing system for serving as an acting officer. It states, "the person *serving* as an acting officer as described under section 3345 may serve in the office -- (1) for no longer than 210 days beginning on the date the vacancy occurs; or (2) ... once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346 (emphasis added). The key term in this section is "serving." "[S]erving" here is used in its active, present form. This suggests that § 3346(a)(2), which allows service during the pendency of a nomination, only applies to acting officers who are currently serving under the FVRA. Thus, someone who had previously served, but then had a period of intervening time in which she could not serve, could not then reassume the office. That person would not be currently serving when she retook the role. This means that Berryhill could not legally have reassumed the role of Acting Commissioner when President Trump nominated Andrew Saul.

In interpreting statutory text, verb tense matters. As the Supreme Court has noted, "[c]onsistent with normal usage, [the Court has] ... frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach." *Carr v. United States*, 560 U.S. 438, 448 (2010). Congress could have easily drafted the statute to say "has served" or "who is eligible to serve," yet that is not the tense Congress chose to use. Congress used the present "serving." This indicates that it did not want § 3346(a)(2) to be a second period of time during which an eligible person could serve as an acting officer. But rather that it wanted it to act as a tolling provision for § 3346(a)(1). What this means in practice is that for those who are eligible to serve under section 3345, they can serve as acting officers for a period

1  of 210 days. *See* 5 U.S.C. § 3346(a)(1). If the President nominates someone to the office
2  they are currently temporarily serving in, the two-hundred-and-ten-day period is tolled, and
3  the acting officer is allowed to stay in that position during the pendency of the nomination.
4  Berryhill's term as Acting Commissioner under the FVRA legally expired on November
5  16, 2017. After that point, she was no longer *serving* as an acting officer under the FVRA.
6  Thus, § 3346(b)(2) could not apply to her.

7      This interpretation of section 3346(a)(1)–(2) has been accepted by other courts. In
8  one of the only published opinions interpreting this section, the United States District Court
9  for the District of Minnesota states, "[b]y its terms, then, the section applies to the person
10  presently serving in that capacity and not to a person who had previously served as Acting
11  Commissioner." *Brian T. D.*, 580 F.Supp.3d at 629.[3] Other courts have also adopted this
12  interpretation. *See Richard J. M. v. Kijakazi*, No. 19-cv-827, 2022 WL 959914, *8 (D.
13  Minn. Mar. 30, 2022); *Stephanie G. v. Kijakazi*, No. 21-cv-1290, 2022 WL 3572936, *3
14  (D. Minn. Aug. 19, 2022).

15      This understanding is also confirmed by the context of Section 3346. Section
16  3346(b)(1) states that if a first nomination for the position does not go through, the person
17  "may *continue to serve* as the acting officer for no more than 210 days ...." 5 U.S.C. §
18  3346(b)(1) (emphasis added). This is also the standard for the failure of a second
19  nomination. *See id.* (b)(2). The section, then, is set up as a series of extensions on the two-
20  hundred-and-ten-day timeline. Each of these extensions begins once the President makes a
21  nomination if, and only if, there is a person lawfully serving as Acting Commissioner at
22  that time. Subsection (a)(2) applies when the President makes a first or second nomination.
23  Subsection (b)(1) and (2) then use the specific language "continue to serve" for instances
24  in which the nomination fails. The use of present tense verbs throughout show that
25  Congress intended to set up an initial timeline and a series of tolling provisions. Otherwise,
26  the Act would not make sense.

27      Some courts have held that Section 3346(a)(2) is not a tolling provision, but rather

28

---

[3] It should be noted that this decision was recently overturned by the 8th Circuit. *See Dahle v. Kijakazi*, -- F.4th --, No. 22-1601, 2023 WL 2379383 (8th Cir. 2023).

is a "spring-back" provision. *See, e.g.*, *Bauer v. Kijakazi*, No. 21-cv-2008, 2022 WL 2918917, *4 (N.D. Iowa July 25, 2022); *Lance M. v. Kijakazi*, No. 2:21-cv-628, 2022 WL 3009122, *13 (E.D. Va July 13, 2022). These courts read this subsection as providing a second substantive time period during which a person who is eligible to serve under section 3345 can serve. Subsection (a)(1) is the initial time period, and Subsection (a)(2) is a second time period, they say. For these courts, it does not matter whether there is a gap of time in between those two periods, because the eligible individual can "spring-back" into the role. Such courts deem one qualified under § 3345 as one who is "serving" under § 3346(a). "Serving," for these courts, thus *only* refers to those who *may* serve as acting officers. *See Bauer*, No. 21-cv-2008, 2022 WL 2918917 at *5. The active verb in the clause, these courts have held, is "may serve." *Id.*; 5 U.S.C. § 3346(a). Thus, they read the statute as not requiring that the person be currently serving, but rather only that they can serve. *See Bauer*, No. 21-cv-2008, 2022 WL 2918917 at *5.

Furthermore, instead of focusing on "serving", these courts see "may serve" as the operative term in the provision. Consequently, they have concluded that the phrase "may serve" is different from the phrase "continue to serve" that is used later in section 3346. They suggest that Congress understood each term to have a distinct and different meaning. These courts discuss the well-established cannon of construction, with which in theory this Court does not disagree, that when a "document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Reading Law* at 170. Because "may serve," which implies future service, is a materially different term from "continue to serve," which implies current service, the two terms should be read and understood differently. Again, this is a proposition with which this Court has no disputes. Thus, these courts have held, contrary to what the *Brian T. D.* court held, it does not matter that § 3346(b) uses the present tense phrase "continue to serve" because this is a different phrase than the future tense phrase "may serve" used in § 3346(a). *See id.* at *6. Again, this is due to the *Bauer* court and other's focus on "may serve" rather than "serving." Consequently, these courts conclude, Berryhill did not need

to be currently serving at the time the President made the nomination for her to resume her service as Acting Commissioner.

The Eighth Circuit recently issued an opinion overruling the decision in *Brian T. D.* asserting that reading "serving" as "currently serving" also does not make sense in light of § 3346(a)(1). *See Dahle v. Kijakazi*, -- F.4th --, No. 22-1601, 2023 WL 2379383 (8th Cir. 2023). Section 3346(a)(1) states that an eligible person may serve "for no longer than 210 days beginning on the date the vacancy occurs ...." 5 U.S.C. § 3346(a)(1). The trigger for service is "on the date the vacancy occurs." Consequently, the Eighth Circuit reasoned, if a person is to be eligible to serve under Subsection (a)(1), they must be "serving as an acting officer before their 210-day period under § 3346(a)(1) begins ...." *Id.* at *2. But this, they state, is "an impossibility." *Id.* Thus, they held, it would not make sense to read "serving" to mean currently serving" because it would be impossible to be already serving on the date the vacancy begins. *See id.*; *see also Bauer*, 21-cv-2008, 2022 WL 2918917 at *5 (noting that such a reading of the statute would mean that "the person must be currently serving at the time of the vacancy ... [t]his makes no sense."). This Court agrees it does not make sense, but it has different reasons for arriving at this conclusion.

The Eighth Circuit's reading misinterprets the structure of Subsection (a)(1). It is also quite strained. Subsection (a)(1) simply describes the length of time that a person may serve and the point in time at which the clock starts running and stops. It states that the two-hundred-and-ten-day period is measured from the date the vacancy occurs. It does not say that a person must be currently serving on the date the vacancy occurs. Furthermore, it is entirely logical to read "on the date the vacancy occurs" as a trigger. At the exact moment the vacancy occurs, the first assistant starts serving. Then, the two-hundred-and-ten-day clock starts to run. Reconstructing the clause in light of this more natural interpretation, it reads "a person currently serving as Acting Commissioner may only serve for 210 days measured from the date the vacancy occurs." Subsection (a)(2) then acts as a tolling provision, or rather as a time period that replaces the one set forth in (a)(1). Rewritten it reads "if during that period of time a first or second nomination for the office is submitted

to the senate, that person may continue to serve for the pendency of the nomination." This reading of the statute makes logical sense. Reading "serving" as "currently serving" means simply that the person is currently serving during the two-hundred-and-ten-day period. The phrase "on the date the vacancy occurs" merely sets forth a beginning point for purposes of time measurement, the trigger for the clock to start running. Only a strained reading would lead to the non-sensical result pointed out by the *Dahle* court and others.

The *Dahle* court held that the more natural reading of the phrase "the person serving" in § 3346(a) was as a "reference to the person qualified to be serving under § 3345 ...." *Id.* at *3. It found that this makes sense given that § 3346 is a timing provision that does not itself grant power to serve. *See id.* But this explanation still does not get around the fact that the word used is the present tense "serving." Obviously the individual must be qualified to serve under § 3345, which is the section of the FVRA that grants the power to serve. But that does not mean that "serving" in § 3346 should then be altered and read in the future tense. Section 3345 determines who is qualified to serve, while § 3346(a) is the trigger for the time period when that service begins. Rewritten, the statute would read, "the person currently serving subject to § 3345 may only serve for 210 days measured from the date the vacancy occurs." The most natural reading is still the one the *Brian T. D.* court gave to the statute: "serving" means "currently serving."

Reading 3346(a)(1)–(2) the way it is framed, as a timing provision, also clarifies the use of the "may serve" language. This language merely states how long the person currently serving is allowed to serve. It should not be read to mean that someone who is not currently serving may in the future serve both during the initial time-period and later after a nomination has been made. It should be read as a constraint on how long the current acting officer is allowed to serve. This becomes clear when seen in another context. If a regulation states that a person serving as a school bus driver may drive between the hours of 9:00AM and 5:00PM, no one would read this to refer to people who are eligible to be drivers but are not yet drivers. Rather it would be interpreted to mean that those who are currently school bus drivers are constrained to certain hours in the day during which they are allowed

to drive. "May serve" in section 3346, then, does not affect the interpretation of "serving," which should be logically read to mean "currently serving."

### b. "Or," Inclusive or Exclusive

The use of the word "or" in Section 3346(a)(1) also shows that Subsection (a)(2) is meant to act as a tolling provision. "Or" is commonly used as a disjunctive. *See Reading Law* at 116; *Lance M.*, No. 2:21-cv-628, 2022 WL 3009122 at *12. This means that it sets forth alternatives. Usually, these alternatives are not mutually exclusive, and any, or all, of the options can be selected. *See Reading Law* at 116. If a store clerk told a customer that they had hats in black or tan, that would not preclude the customer from purchasing two hats, one in each color. Yet it does not have to take on this inclusive form. "Or" frequently can have an exclusive sense. *See* Brian A. Garner, *A Dictionary of Modern Legal Usage* 624 (2001). What form "or" takes depends on context. Here there are three contextual clues that show that "or" was meant to take on an exclusive form.

First, "or" modifies the entire phrase in (a)(1). As was noted above, that phrase is a timing mechanism that limits the length of service to "no longer than" two-hundred-and-ten-days. Thus, (a)(2), on the other side of the "or" would seem to be an alternative length of service rather than an alternative period of service. So, a person eligible to serve under Section 3345 can serve either for two-hundred-and-ten-days (Subsection (a)(1)) or for the pendency of a nomination (Subsection (a)(2)) if the President nominates during the two-hundred-and-ten-day period. The individual cannot serve for the full term of both. The lengths of time that one can serve for are in this instance interconnected yet exclusive in that the period in (a)(2) replaces the period in (a)(1) once it is properly triggered.[4] As the *Brian T. D.* court noted, "[i]n this statute 'or' serves to provide an alternative *length* of service not to create a series of non-contiguous periods of service." *Brian T. D.*, 580

---

[4] The phrase "interconnected yet exclusive" means that each time period is dependent on the other. But no individual can serve the entire length of both. Even if the President were to nominate someone at the last second on the two-hundred-and-ninth-day, the Acting Commissioner still would not have served for the full statutory period in (a)(1). He would, at that moment, automatically have switched into the time period set out in (a)(2). They are connected in that the President has to nominate during the pendency of (a)(1) for (a)(2) to be triggered, yet exclusive in that no one can serve the entire statutory period of both.

F.Supp.3d at 631 (emphasis in original). Because (a)(1), which specifies a length of service, was modified, as a whole, the alternative provided for by (a)(2), after "or," modifies that length of time, acting as a tolling provision.

Second, the structure of the two clauses is not "A or B" but "A or, once X occurs, then B." The statute, then, does not present a straightforward choice. This aspect of the statute has yet to be analyzed by any court. Yet it would seem to weigh against the "or" here being an inclusive term. The statute allows an eligible individual to serve for two-hundred-and-ten-days. *See* 5 U.S.C. § 3346(a). If the President decides to nominate a permanent officer, however, then the option of serving as acting officer during the pendency of the nomination comes into being. *See id.* Unlike the standard use of "or" as inclusive, both choices are not available at the same time. This is not the case of the store clerk telling the customer that there are two color choices for hats and the customer ordering both. Here, only once a triggering event happens does the second option become available. Thus, it makes more sense to read Subsection (a)(2) as a tolling provision that comes into force when the President nominates a replacement. When this occurs, the two-hundred-and-ten-day clock stops, and the pendency of the nomination clock begins.

Finally, the fact that the statute uses the word "or" instead of "and" also signals that Subsections (a)(1) and (a)(2) are interconnected yet exclusive. Since this subsection is permissive, in that it allows an eligible person to serve for a specified period of time, and limits service to that length of time, if Congress wanted to give that individual the option to serve for two-hundred-and-ten-days, and then, at a later moment in time, serve during the pendency of the nomination, it could easily have used "and" to signify that both options were available. Defendant here is asking the Court to read "or" as "and" so that the statute is interpreted to mean that Berryhill had the authority to reassume the role of Acting Commissioner upon the nomination of Andrew Saul. Yet, "[c]onstruing the word 'or' to mean 'and' is ... clearly in contravention of its ordinary usage." *Brian T. D.*, 580 F.Supp.3d at 631. Congress did not want both options to be available as two separate, independent time periods in which an eligible individual could serve. The context makes clear that

Subsection (a)(2) is a tolling provision that alters the timeframe set forth in (a)(1).

Some courts, including the Eighth Circuit in *Dahle*, have read "or" as providing an inclusive alternative. They have held that Subsections (a)(1) and (a)(2) are two distinct periods of time during which an eligible individual can serve as acting officer. *See Dahle*, -- F.4th --, No. 22-1601, 2023 WL 2379383 at *2; *see also Bauer*, 21-cv-2008, 2022 WL 2918917 at *8. These courts see the "or" as creating a situation in which A or B can be chosen at any time. B becomes available once the President submits a nomination to the position. They rely on the fact that "nothing [explicit] in the statute requires that the nomination be made during the initial 210-day period for Subsection (a)(2) to apply." *See Bauer*, 21-cv-2008, 2022 WL 2918917 at *8. As the *Dahle* court found, "[t]here is simply no textual basis to imply that subsection 1 and its 210-day limit somehow restrict a person's service under subsection 2." *Dahle*, -- F.4th --, No. 22-1601, 2023 WL 2379383 at *2. This inclusive form of "or" is the "ordinary meaning" of the word, they have held. *Id.* Furthermore, the *Bauer* court notes that Congress did not choose to qualify "or" with "either[.]" *See Bauer*, 21-cv-2008, 2022 WL 2918917 at *7. This, it found, indicates that Subsections (a)(1) and (a)(2) are not exclusive. *See id.*

Yet, as noted above, and by the *Bauer* court, "the meaning of 'or' will always depend on the context of its use ...." *Id.* The context of the use of "or" here shows that it was not meant to be inclusive, but rather exclusive. Contrary to the court's finding in *Dahle*, there are numerous textual bases that suggest that "or" here sets forth two interconnected and exclusive time periods of service. Section 3346 was meant to set forth an initial timeframe in which an eligible person was allowed to serve as Acting Commissioner and then create a tolling provision that was triggered by the occurrence of a specific event, here the nomination of a permanent Commissioner. The word "or" must be read in the context of the word "once," as well as in light of the fact that it modifies the entirety of Subsection (a)(1) and the fact that the word "and" was not used. This context shows that "or" separates two interconnected, exclusive lengths of time, the first, an initial length of time, and the second, a tolling period.

1

### c.  Section 3348

2    Most importantly, reading the text of Section 3346 as creating a second time period

3  of service when the President makes a nomination would contradict Section 3348. When

4  interpreting statutes, courts must look to the "language and design of the statute as a

5  whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The statutory text

6  involved cannot be looked at in isolation. Additionally, when looking at different

7  provisions of a statute, they should be "interpreted in a way that renders them compatible,

8  not contradictory." *Reading Law* at 180. Thus, Sections 3346 and 3348 must be interpreted

9  so that they are in harmony. Section 3348(b) reads "[u]nless an officer or employee is

10 performing the functions and duties in accordance with sections 3345, 3346, and 3347 ..."

11 if no permanent officer is available to serve, "the office shall remain vacant[.]" 5 U.S.C §

12 3348(b). Importantly, this provision uses the phrase "is performing." By using the present

13 tense, this provision seems to be saying that unless there is someone currently serving as

14 the acting officer, the office will remain vacant. Thus, once the office becomes vacant it

15 cannot be filled by an acting officer again because there would be no one currently in that

16 role.

17    This interpretation of § 3348(b) makes sense if § 3346(a)(2) is read as a tolling

18 provision rather than as a second, separate time period in which someone can serve as an

19 acting officer. If the appointed officer can no longer serve, the acting officer can serve for

20 two-hundred-and-ten days. If during that time period the President makes a nomination,

21 the acting officer can continue to serve throughout the pendency of the nomination. If the

22 President fails to nominate someone during that time, however, the acting officer must

23 leave that role, and the office will become vacant. Since no one will be "performing the

24 functions and duties" in accordance with the Act at that time, the office must remain vacant.

25 Reading § 3346 otherwise would render § 3348(b) unintelligible. If at the moment a

26 nomination is made a person can once again become the acting officer, then the office

27 would not remain vacant. These two provisions would be in direct conflict with each other.

28 Thus, the more logical way to read § 3346(a)(2) is as a tolling provision that extends the

time a person is allowed to serve as an acting officer.

This reading is also the only way to make sense of a second provision in § 3348. Section 3348(c) reads, "[i]f the last day of any 210-day period under section 3346 is a day on which the Senate is not in session, the second day the Senate is next in session and receiving nominations shall be deemed the last day of such period." This provision extends the end of the two-hundred-and-ten-day period so that it can end *after* the Senate has had an opportunity to receive a nomination from the President. It is designed to ensure that a nomination can be made during the initial acting service period. This provision only makes sense if § 3346(a)(2) is a tolling provision that can only be taken advantage of if the President nominates a candidate during the two-hundred-and-ten-day period. Otherwise, it becomes pointless. If an eligible individual can reassume the role of acting officer any time the President submits a nomination, then there would be absolutely no need for the initial period to be extended. It is a well-established standard of statutory interpretation that, if possible, every provision in a statute should be given effect, and none "should needlessly be given an interpretation that causes it to ... have no consequence." *Reading Law* at 174. As the Supreme Court has noted, it is an established principle that "a court should give effect, if possible, to every clause and word of a statute." *Moskal v. United States*, 498 U.S. 103, 109 (1990) (internal quotations omitted). This Court will not read § 3348(c) out of the statute. Section 3346(a)(2) must be read as a tolling provision rather than as an independent grant of time.[5]

This interpretation also makes sense given the incentives Congress might have been trying to put in place through this system. If the office has to remain vacant if the President fails to nominate a replacement during the two-hundred-and-ten-day period, this will incentivize the President to promptly nominate a new officer. The President, logically, would want to ensure that the office is occupied so that the agency can function. This tolling structure, "incentivizes the President to promptly nominate someone to fill the vacant office to ensure that the office's functions and duties continue to be performed." *Brian T. D.*, 580

---

[5] No reference in this Section is made to *Dahle* as the Eighth Circuit did not discuss Section 3348.

F.Supp.3d at 630. If, to the contrary, a person can assume the role upon the nomination of a full-time officer, no matter if the two-hundred-and-ten-day period has elapsed, then there would be no incentive. Furthermore, the fact that the office must remain vacant if there is no permanent officer and no acting officer incentivizes Congress to quickly approve the nomination. In that circumstance the office could not be filled until a permanent officer was confirmed. This would prompt Congress to act faster. Under the alternative reading, that (a)(2) is a second time-period during which an acting officer can serve, a person can serve as an acting officer the minute the President makes a nomination, and neither the President nor Congress would have to worry about the office staying vacant until a confirmation. Such a reading undoes the incentive structure set up by the statute.

### d.  Supreme Court Dicta and Secondary Sources

The text of the statute, when looked at as a whole, makes clear that Section 3346(a)(2) is a tolling provision that provides an extension of the time an eligible person may serve as an acting officer under certain circumstances. It is not an independent grant of time. This should be the end of the discussion as nothing else need be consulted. The Supreme Court has stated on numerous occasions, "[t]here is no need to consult extratextual sources when the meaning of a statute's terms is clear." *McGirt v. Oklahoma*, 140 S.Ct. 2452, 2496 (2020). Indeed, the only proper role for such sources is to help clear up ambiguity surrounding the original meaning of statutory text. *See id.* Yet, a brief mention of how other sources have interpreted this provision is beneficial here because it confirms this Court's interpretation of the statute. It also shows that this subsection has been understood as a tolling provision since it was added to the law in the late 1990s.

Early commentary on the Federal Vacancies Reform Act noted that the Act was structured to allow an individual to serve as an acting officer for a limited period of time. *See* Rosenberg at 10. This Congressional Research Service report noted that "[t]he limitation period *is suspended*, however, if a first or second nomination [to the office] is submitted to the Senate for as long as the nomination is pending in that body." *Id.* at 11 (emphasis added). It also specifically discusses the situation in which a President fails to

submit a nomination before the close of the two-hundred-and-ten-day period. "[i]f the President submits no nomination" during that time period, "the options available under the Act can no longer be utilized." *Id.* Therefore, if the initial time period expires and the President does not submit a nomination, the office must remain vacant even if the President later submits a nominee to the Senate for confirmation. This not only makes sense looking at the plain text of the Act, but as the report notes, fits with the goal of ensuring "timely presidential submission of nominations and minimization of the period during which unconfirmed acting officials serve in key positions meant to be politically responsible and responsive." *Id.* at 10. While this interpretation from an extratextual source should not be seen as authoritative by any means, it does confirm what the text of the Act clearly states, § 3346(a)(2) is a tolling provision.

This too is the reading given to this section by the Supreme Court, although in dicta. In *N.L.R.B. v. SW General, Inc.*, the Court was called on to interpret § 3345, the eligibility section of the FVRA. *See N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 293 (2017). In its discussion, it also described the operation of § 3346. The Court stated, "In most cases, the statute permits acting service for '210 days beginning on the date the vacancy occurs'; *tolls* that time limit while a nomination is pending; and starts a new 210-day clock if the nomination is 'rejected. . ., withdrawn, or returned.'" *Id.* at 296 (emphasis added). Although only a brief discussion, this dicta shows how the highest court in the land understands the operation of the timing provisions in the Act. They are not two separate grants of time, but rather an initial grant of time and a tolling provision that extends that period if the President submits a nomination before the initial grant has expired.

Defendant argues that the legislative history of the Act provides insight into the real meaning of the statutory text. It points to the Senate report on the bill and a report from the Office of Legal Counsel, among other external sources, to assert that § 3346(a)(2) is an independent grant of time rather than a tolling provision. This is also what the *Dahle* court pointed to in order to provide evidence for its reading of § 3346. *See Dahle*, -- F.4th --, No. 22-1601, 2023 WL 2379383 at *3. Yet as the Supreme Court has stated numerous times,

when "presented with clear statutory language" legislative history should not be consulted. *Milner v. Dept. of Navy*, 562 U.S. 562, 574 (2011).[6] It is a central maxim of statutory interpretation that legislative history, if it is to be used at all, should only be used to "clear up ambiguity, not create it." *Id.* (quoting *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950). More fundamentally, in doing the work of statutory interpretation the text is paramount, and it seems inappropriate to consult easily manipulable legislative or other history. *Reading Law* at 376–78 (noting that "the use of legislative history to find 'purpose' in a statute is a legal fiction that provides great potential for manipulation and distortion."). As Justice Scalia and Brian Garner have noted "when legislators expect judges to take ... [floor] statements and [committee] reports as authoritative expressions of 'legislative history,' the primary purpose of the exercise has become influencing courts rather than informing congressional colleagues." *Id.* at 377. The text is what should be consulted when interpreting statutes. As one Supreme Court Justice has noted, "[f]rom the beginnings of the republic, American law followed what is known as the 'no-recourse doctrine'—that in the interpretation of a text, no recourse may be had to legislative history." *Id.* at 369. Using legislative history was not seen as a legitimate part of statutory interpretation. It also poses a major theoretical problem on many levels. First, if this nation has a government of laws and not of men, then the text of the laws themselves governs, not the intent of men as expressed in committee reports or floor speeches. *See id.* at 375. Second it is an odd exercise to attempt to determine the intent of the legislature as a body. How can a legislature have one single intent that a court is able to discern? Different members of the body may have voted for the Act for different reasons or had different interpretations of what the Act required. Additionally, things like committee reports are drafted by small groups of committee staffers. It would be difficult if not absurd to say that these represent the understandings of every member of the bodies that voted for the legislation. Finally, using legislative history presents a constitutional problem. The Constitution requires that

---

[6] It should be noted that the Eighth Circuit acknowledged the general proposition that when the text is clear extratextual sources should not be consulted. *See Dahle*, -- F.4th --, No. 22-1601, 2023 WL 2379383 *3. They consulted the legislative history, however, to strengthen their interpretation of the FVRA. *See id.*

every bill that is to become a law go through the processes of bicameralism and presentment. U.S. Const. Art. I, § 7, cl. 2. This means that each piece of proposed legislation must pass both the House and the Senate (bicameralism) and must be presented to the President and signed by him (presentment). Only language that has gone through this constitutional process can be governing law. Because legislative history, including committee reports and floor speeches, has not gone through this process, it is not law, and it does not govern. The only language that has gone through this process is the text of the statute itself. Relying on legislative history, particularly in the face of relatively clear statutory language, "contravenes the constitutional requirement of bicameralism and presentment." John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 Columbia L. Rev. 673, 695 (1997). Thus, this Court will not look to legislative history to warp the meaning of the statutory text in favor of Defendant.

### e.  Nexus to Harm

Although this Court finds that Berryhill was not lawfully serving as Commissioner of the Social Security Administration at the time she ratified the appointments of the SSA ALJs, it is inappropriate to remand because there is no nexus between this unlawful action and the harm suffered by Plaintiff. In order to grant relief to a party it must be shown that the unlawful action actually led to a particularized harm to a plaintiff. *See Collins v. Yellen*, 141 S.Ct. 1761, 1788–89 (2021). Relief cannot merely be based on a violation of the law in the context of agency action. Rather, the legal violation must have "affected the complained-of decision." *Id.* at 1801 (Kagan, J., concurring). Here, it must be shown that the fact that Berryhill was unlawfully serving as acting Commissioner of the Social Security Administration caused a harm to Plaintiff related to the decision reached by the ALJ. Another way of looking at it is to ask whether "the agency's head might have altered [her] ... behavior in a way that would have benefitted the party" were she serving lawfully. *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (internal quotations omitted). Ultimately there must be a nexus between Berryhill's unlawful service and the harm of being denied benefits.

1    Plaintiff presents no evidence of a connection between the fact that Berryhill was
2    unlawfully serving and the fact that her claim was denied. Plaintiff asserts that her harm
3    stems from the fact that Berryhill ratified the nominations of the ALJs when she had no
4    power to do so. Yet nothing suggests that if she did have power that she would have
5    nominated other ALJs, or that she nominated unqualified ALJs, or that the ALJ who
6    decided Plaintiff's case would either have decided it differently, had the ALJ been
7    appointed by a lawfully serving acting commissioner, or that the ALJ decided Plaintiff's
8    case the way she did because she was appointed by Berryhill. There simply is no connection
9    between Plaintiff being denied benefits and Berryhill's unlawful service. The failure to
10   follow the law did not actually harm Plaintiff. *See Kaufmann*, 32 F.4th at 849 (noting that
11   "[a] party challenging an agency's past actions must ... show how unconstitutional removal
12   provision *actually harmed* the party [.]" (emphasis in original). Although this case does not
13   deal with an unconstitutional removal provision, the logic extends to the case of illegal
14   service. *See Collins*, 141 S.Ct. at 1795 (Gorsuch, J., concurring) (noting that there is not a
15   meaningful difference between an issue relating to removal and appointment.).  Although
16   Berryhill was not lawfully serving at the time she took the complained of action, there is
17   no connection between that unlawful service and Plaintiff's denial of benefits.

18          Plaintiff cannot claim that she suffered harm because she was denied a valid
19   administrative adjudicatory process. In order to demonstrate a nexus, the harm must be
20   particularized to the Plaintiff. *See Tyson v. Kijakazi*, No. 1:21-cv-00688, 2023 WL
21   2313192, *6 (E.D. Cal. Mar. 1, 2023). Whether Plaintiff was denied a valid process within
22   the Social Security Administration does not matter here because that is not a specific harm
23   that she suffered. Rather it is a transformation of her claim that Berryhill was not lawfully
24   serving when she ratified the ALJs' appointments into a harm. It is a general grievance that
25   affected all proceedings rather than a particular harm that she suffered because Berryhill
26   was not lawfully serving. As there is no basis to establish a nexus between the actions of
27   Berryhill and any harm suffered by Plaintiff, this Court cannot grant a remand on this basis.
28

### III.   LEGAL STANDARD FOR EVALUATING SSA ISSUES

Because there is no nexus between Berryhill's actions and Plaintiff's harm, this Court must now turn to the merits of Plaintiff's Social Security claim.

This Court may not overturn the ALJ's denial of disability benefits absent legal error or a lack of substantial evidence. *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018). Substantial evidence means "More than a Scintilla ... but less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations omitted). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). Under this standard, courts look at "an existing administrative record and ask[] whether it contains sufficient evidence to support the [ALJ's] ... factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). This Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.2007) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014)). The ALJ, not this Court, draws inferences, resolves conflicts in medical testimony, and determines credibility, however. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984). Thus, the Court must affirm even when "the evidence admits of more than one rational interpretation." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

### a.  The SSA's Five Step Evaluation Process

To qualify for social security benefits, a claimant must show she "is under a disability." 42 U.S.C. § 423(a)(1)(E). A claimant is disabled if she suffers from a medically determinable physical or mental impairment that prevents her from engaging "in any substantial gainful activity." *Id.* § 423(d)(1)–(2). The SSA has created a five-step process

1  for an ALJ to determine whether the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(1).

2  Each step is potentially dispositive. *See id.* § 404.1520(a)(4).

3      At the first step, the ALJ determines whether the claimant is "doing substantial

4  gainful activity." *Id.* § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* Substantial

5  gainful activity is work activity that is both "substantial," involving "significant physical

6  or mental activities," and "gainful," done "for pay or profit." *Id.* § 404.1572(a)–(b).

7      At the second step, the ALJ considers the medical severity of the claimant's

8  impairments. *Id.* § 404.1520(a)(4)(ii). If the claimant does not have "a severe medically

9  determinable physical or mental impairment," the claimant is not disabled. *Id.* A "severe

10  impairment" is one which "significantly limits [the claimant's] physical or mental ability

11  to do basic work activities." *Id.* § 404.1520(c). Basic work activities are "the abilities and

12  aptitudes necessary to do most jobs." *Id.* § 404.1522(b).

13      At the third step, the ALJ determines whether the claimant's impairment or

14  combination of impairments "meets or equals" an impairment listed in Appendix 1 to

15  Subpart P of 20 C.F.R. Part 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is disabled.

16  *Id.* If not, before proceeding to step four, the ALJ must assess the claimant's RFC. *Id.* §

17  404.1520(a)(4). The RFC represents the most a claimant "can still do despite [her]

18  limitations." *Id.* § 404.1545(a)(1). In assessing the claimant's RFC, the ALJ will consider

19  the claimant's "impairment(s), and any related symptoms, such as pain, [that] may cause

20  physical and mental limitations that affect what [the claimant] can do in a work setting." 

21  *Id.*

22      At the fourth step, the ALJ uses the RFC to determine whether the claimant can still

23  perform her "past relevant work." *Id.* § 404.1520(a)(4)(iv). The ALJ compares the

24  claimant's RFC with the physical and mental demands of the claimant's past relevant work.

25  *Id.* § 404.1520(f). If the claimant can still perform her past relevant work, the ALJ will find

26  that the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv).

27      At the fifth and final step, the ALJ determines whether—considering the claimant's

28  RFC, age, education, and work experience—she "can make an adjustment to other work."

*Id.* § 404.1520(a)(4)(v). If the ALJ finds that the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* If the ALJ finds that the claimant cannot make an adjustment to other work, then the claimant is disabled. *Id.*

## IV.   DISCUSSION OF THE ALJs ANALYSIS

### a.  Step Five Determination

Plaintiff argues that the ALJ erred at step five in finding that she had transferrable skills that would enable her to do other types of work (Doc. 11 at 4). She asserts that although the ALJ relied on the unchallenged testimony of the vocational expert (VE), the ALJ "failed to assess the level of vocational adjustment required" based on claimant's age. Because the ALJ never considered the rules related to skill transferability for people of advanced age, she claims, the ALJ's decision was wrong. She also asserts that the other occupations that the ALJ found she could do were not similar enough to her previous job to constitute alternate available jobs. Ultimately because the ALJ failed to evaluate and apply the transferability standards that apply to people of advancing age, the analysis as a whole, she contends, is flawed.

In determining whether a claimant has transferable skills, the ALJ must assess whether the skilled or semi-skilled work activities claimant did in past work "can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d). At this step, the Commissioner bears the burden of proving that the "claimant can perform other work in the national economy, given the claimant's RFC, age, education, and work experience." *Gonzales v. Colvin*, No. CV-12-01068-AA, 2013 WL 3199656, at *3 (D. Or. June 19, 2013) (citations omitted). Transferability is "most probable and meaningful" for jobs that involve the "same or lesser degree of skill[,]" the "same or similar tools and machines[,]" and the "same or similar raw materials, products, processes, or services[.]" *Id.* This does not mean that transferability is automatically found in these contexts, nor does it mean that these are required for a finding of transferability. It simply means transferability is more likely in these contexts. Skills are not transferable when "skills are so specialized or have been acquired in such an isolated

vocational setting ... that they are not readily usable in other industries, jobs, and work settings ...." *Id.* For persons closely approaching retirement age, defined as sixty years or older, who are limited to light-work, an ALJ can only find that skills are transferable if the light work is "so similar to" claimant's previous work, that she "would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." *Id.* In making this determination, the ALJ may rely on testimony from a VE. *See Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995) (quotation omitted). As the Ninth Circuit has noted "in the absence of any contrary evidence, a [vocational expert's] testimony is one type of job information that is regarded as inherently reliable ..." *Ford v. Saul*, 950 F.3d 1141, 1160 (9th Cir. 2020) (citations omitted). Thus, an ALJ can rely on testimony by a vocational expert to make a step 5 determination.

This is exactly what the ALJ did here. Thus, the ALJ's decision is supported by substantial evidence. The ALJ noted that the VE did not merely state the jobs that Plaintiff's skills were transferable to, but specified what those skills were: customer service skills, working with the public, and computer skills. (*See* Doc. 10-3 at 54). The VE was also asked about whether there were available jobs in the national economy to which Plaintiff could transfer those skills given her age, education, past relevant work experience, and RFC. (*See id.* at 55). There were two jobs that the VE stated that Plaintiff could do, customer service representative/order clerk and customer service representative/sales person. (*See id.*). Finally, the VE stated that "these positions would not require more than a minimal vocational adjustment." (*See id.*). This testimony was unchallenged by Plaintiff's attorney. (*See* Doc. 15 at 5). The ALJ was justified in relying on the VE's testimony. And although the jobs identified by the VE might have different codes and industry designations in the Dictionary of Occupational Titles than Plaintiff's previous job, the jobs that are available do not have to be exactly the same. Furthermore, contrary to Plaintiff's assertion, the ALJ noted, and relied upon, the VE's testimony that "these positions would not require more than a minimal vocational adjustment." (Doc. 10-3 at 55). This Court finds that the ALJ's step 5 determination was justified and supported by the evidence.

1    Finally, Plaintiff challenges the ALJ's RFC assessment, claiming that she failed to

2    include an assessment of whether Plaintiff had issues with maintaining concentration,

3    persistence, and pace. (*See* Doc. 11 at 12). Plaintiff asserts that because the ALJ found a

4    mild limitation in this area in step 2, that she was required to explicitly discuss it in the

5    RFC analysis. (*See id.* at 12–14). Because there was no discussion of this, Plaintiff

6    maintains, this was more than harmless error and is a basis for remand. This Court does

7    not find this to be legal error.

8    At step 2 the ALJ concluded that Plaintiff was only mildly impaired in the area of

9    concentration, persistence, and pace. (*See* Doc. 10-3 at 47). She noted that

10   > The person can drive, watch and follow television programs,
11   > care for pets, read, live alone, and manage their (sic)
       > household. There is no evidence of slow mentation or speech
12   > in the file indicating depressed cognition. The claimant was not
       > noted to be easily distracted at medical appointments and could
13   > provide an adequate history to their (sic) physicians.

14   (*Id.* at 47–48).

15   Later, in the RFC assessment, the ALJ noted that "there is nothing to support that

16   the claimant could not concentrate on simple work tasks as even the claimant reported that

17   she could pay attention for hours ...." (*Id.* at 53). Consequently, the ALJ considered

18   Plaintiff's alleged mental impairment and found that it did not affect her RFC. Agency

19   regulations merely require an ALJ to "consider the limiting effects of all [Claimant's]

20   impairment(s), even those that are not severe, in determining [Claimant's] residual

21   functional capacity." 20 C.F.R § 404.1545(e). This does not "necessarily require the

22   <u>inclusion</u> of every impairment into the final RFC if the record indicates the non-severe

23   impairment does not cause a significant limitation in the plaintiff's ability to work."

24   *Medlock v. Colvin*, No. CV 15-9609, 2016 WL 6137399, *5 (C.D. Cal. Oct. 20, 2016)

25   (emphasis in original). The ALJ assessed the record and found only a mild impairment at

26   step 2. Consequently, she found it did not to affect her ability to concentrate at work. Given

27   this, there was no need for the ALJ to explicitly include a discussion of her finding of a

28   mild limitation in her RFC determination or to include it in her hypothetical to the VE. If

the limitation does not actually affect Plaintiff's RFC, then including it in the RFC discussion is not necessary. This Court finds that there was no legal error and that the ALJ's RFC determination was appropriate.

**V.    CONCLUSION**

Accordingly,

**IT IS ORDERED** that the ALJ's decision is **AFFIRMED.**

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated this 28th day of March, 2023.

James A. Teilborg
Senior United States District Judge